# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| CORY ADAM CONWAY, | |
| Plaintiff, | Case No. 22-CV-1004-KEM |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| DUBUQUE COUNTY, IOWA, et al., | |
| Defendants. | |

Plaintiff Cory Adam Conway suffers from diabetes and mental health conditions, including post-traumatic stress disorder (PTSD). After being detained in the Dubuque County Jail, he experienced a mental health episode. Defendant Deputy Lucas Pothoff responded and Conway's wrist was broken when they went to the floor during the incident. Conway brings claims of deliberate indifference and excessive use of force. Defendants move for summary judgment, arguing Conway cannot show deliberate indifference or the use of excessive force. Doc. 13. Conway resisted (Doc. 17), and Defendants filed a reply (Doc. 21). For the reasons that follow, I **grant** summary judgment on all counts.

## I. BACKGROUND

The following facts are recited in the light most favorable to Conway, the nonmoving party.[1] Conway was booked into the Dubuque County Jail as a pretrial detainee on February 10, 2021. During his intake, a screening officer completed an

---

[1] Unless otherwise noted, the facts in this section are taken from admitted portions of Defendants' Statement of Facts (Def. SOF) (Doc. 13-2), Plaintiff's Statement of Facts (Pl. SOF) (Doc. 17-3), and Defendants' Reply (Def. Reply (Doc. 21)), as well as video of the incident (submitted by Defendants).

Inmate Medical Screening form. *See* Def. App. 72-74.[2] Conway reported being treated for diabetes with daily insulin (Def. App. 73), and for anxiety and PTSD without medication. Conway reported a suicide attempt in 2010 (attempted insulin overdose) and that he had been committed after the 2010 suicide attempt. Def. App. 73-74. Nothing about Conway's behavior indicated a risk of suicide, and Conway reported he was not thinking about hurting himself or feeling suicidal. Def. App. 72-73. A Medical Problem List showed that Conway was allergic to amoxicillin and that he had diabetes, suicidal tendencies, depression, PTSD, and anxiety. Def. App. 77.

Conway came to the jail after being hospitalized for mental health issues. Def. App. 72, 81-97. Jail staff received Conway's discharge records from Mercy Hospital, which show Conway was prescribed a one-time antipsychotic, paliperidone injection (Invega Sustenna), and medication administration record shows he was given that injection on February 18, 2021. Def. SOF ¶ 12-13; Def. App. 101. The discharge records also showed a continuation of his rapid-acting insulin ("1 unit/10 gm carbs Subcutaneous with Meals Three Times a Day and snacks"), and a medication update to start taking long-acting insulin (Lantus). Pl. SOF ¶ 36; Def. App. 82-83, 91-92. The jail completed a Medication Verification on February 12, which listed a sliding scale of regular insulin with meals, Lantus insulin (starting 20 units twice daily), and the single injection of Invega Sustenna. Pl. SOF ¶ 38; Def. App. 100.

Conway's blood sugar was checked at mealtimes and he acknowledged he received insulin while in custody. Def. App. 111-12. A Blood Sugar Finger Stick form shows Conway's blood sugar was tested three to four times daily from February 11 to February 23. Def. App. 79, 102. A Medication Administration Record shows Conway received the following medications while in jail: Lantus (10 unit) at 7:00 a.m. from February 18 to February 20; Lantus (20 units) at bedtime from February 12 to February 22; and

---

[2] "Def. App." refers to Defendants' Appendix (Doc. 13-3) and "Pl. App." refers to Plaintiff's Appendix (Doc. 17-1).

regular insulin, sliding scale with meals, at 7:00, 12:00, and 20:00 (no specific dates listed, sliding scale guide included on the page). Def. App. 80, 103. An attachment to the Medication Administration Record shows amounts of insulin administered for listed blood sugar levels from February 20 to February 23. Def. App. 104.

On February 17, 2021, a Medical Progress Note shows that Conway expressed concern over getting too much insulin and requested to take only 10 units (rather than 20 units) of Lantus in the mornings. Def. App. 78. The nurse indicated Conway's blood sugar levels would continue to be monitored and "will adjust as needed." Def. App. 78. Conway was started on a morning dose of Lantus on February 18. Conway submitted a sick call request on February 18 for pain in his left eye "due to high blood sugar." Def. SOF ¶ 14; Def. App. 78, 105. Conway visited the doctor's office, and the nurse provided him with a seven-day supply of Tylenol. Def. SOF ¶ 7; Def. App. 40, 78.

A February 18 incident report shows that Conway's blood sugar was at 62 prior to dinner. Def. App. 38. A nurse was consulted after Conway's blood sugar level was tested. The nurse instructed Conway to hold off because meal trays were ten minutes away. Conway said he "felt low" but did not feel like he would pass out, and he said he could wait for dinner. Def. App. 39. After that meal, Conway indicated he was feeling much better. *Id.*

On February 19, Conway complained about the jail's management of his blood sugar, specifically that he had not been helped or cared for. In a Sick Call Request, he indicated that "[a]fter numerous days of high blood sugars, [he] still [had not] been helped or cared for." Def. App. 106. He requested the release of his blood-sugar readings to family and to Mercy Hospital, the response to which indicated the jail physicians would be shown his blood-sugar readings. Def. SOF ¶ 15; Def. App. 106.

Conway approached jail staff on February 21, 2021, complaining he felt warm and may have a fever. Def. App. 51. Staff checked his temperature, which was normal. *Id.* Conway indicated he was diabetic, and staff had him check his blood sugar, which

3

was 74. *Id*. Because the level was close to 70, jail staff gave Conway a diabetic snack, and Conway said the snack should hold him over until breakfast. *Id*. Staff told Conway to let them know if he started "feeling low again." *Id*. There is no indication that he ever made such a report.

As for Conway's mental health, he remembers seeing a psychiatrist one time at Hillcrest Family Services, during which they talked about his PTSD, and being given the Invega Sustenna injection. Pl. SOF ¶ 45; Def. App. 111. The record shows that on February 16, an appointment was scheduled for February 18 for "an intake therapy appointment to get [Conway] started with services" February 18. Def. App. 98. Conway was given an injection of Invega Sustenna at the hospital and one shot while detained. Def. App. 111. He did not have a long history with this medication. Pl. SOF ¶ 45. Prior to being admitted to the jail, he was "in the process of getting some form of [mental health] treatment." Pl. App. 6. After being released from custody, Conway saw a mental health counselor once per month. Pl. App. 7.

On February 23, Conway submitted a Sick Call Request about trouble urinating, which jail staff forwarded to the nurse. Def. App. 107. The Request made no mention of mental health concerns. *Id*. Also on that date, Conway went to Deputy Pothoff to fill out a blue slip (Sick Call Request)[3] to request help—he was feeling helpless and hopeless. Def. App. 111. After he told Deputy Pothoff that he was having suicidal thoughts, Conway walked to a nearby table[4] and sat down. Deputy Pothoff reported that when he

---

[3] Detainees can obtain medical treatment in non-emergency situations by going to a deputy to fill out a blue slip. Pl. SOF¶ 50; Def. Reply ¶ 50; Pl. App. 47 (Deputy Pothoff testified that, in cases of emergency or where treatment is needed right away, nurses are called at that time rather than following the regular blue slip process).

[4] Conway said that Deputy Pothoff told him there was nothing Deputy Pothoff could do for Conway, but Deputy Pothoff did not deny Conway a blue slip. Def. App. 111. Deputy Pothoff indicated that when Conway told him he was having suicidal thoughts, Deputy Pothoff attempted to get additional information from Conway but he walked away. Pl. App. 50. The video shows that after Conway walked away from Deputy Pothoff and sat down at the table, Deputy Pothoff was walking toward Conway.

tried to ask Conway questions to assess his medical needs, Conway walked away and did not go back to talk to Deputy Pothoff as he had instructed, so Deputy Pothoff started to go over to Conway. Def. App. 55, Pl. App. 51. Conway forcefully banged his head on a table from a sitting and then a standing position. The third time he hit his head, Conway fell to the floor. He was at first still, but then began to thrash around and yell. Deputy Pothoff stood over Conway, put his hand on Conway's chest and told him to stop. Conway continued to yell, and Deputy Pothoff radioed for help. Conway worked to stand up, at which point Deputy Pothoff put his arms around Conway from behind, and they ended up on the ground.[5] When they hit the ground, Conway's arm was broken just below the wrist (bone protruded through his skin). Def. App. 55-56, 58. Deputy Pothoff completed an incident form indicating that Conway said he was having suicidal thoughts and then proceeded to "hit head off day room table until physically restrained." Def. App. 54. Deputy Pothoff also reported that he restrained Conway to prevent him from harming himself further, and that "Conway's entire body was tense as we went to the floor and he continued to pull away from me." Def. App. 55. Conway never posed a risk of harm to Deputy Pothoff to necessitate the use of force.

Conway stated that the next thing he recalled after banging his head on the table was Deputy Pothoff tackling him to the ground with a hip thrust. Conway believed Pothoff intentionally threw him to the ground, but he could not recall specific details of the incident. Def. App. 112. Conway alleges in the complaint that he was handcuffed after his arm was broken, but he has no personal recollection of that happening. Def. SOF ¶ 21; Def. App. 112-13. There is also nothing in the record to indicate that Conway was placed in handcuffs.

---

[5] The parties dispute why Deputy Pothoff tried to restrain Conway (Defendants argue it was to prevent him from harming himself, which Conway disputes).

5

At the time of this incident, Defendants were required to adhere to the Dubuque County Jail's policies and standards.[6] All staff are trained on these policies within ninety days of being hired and are required to take a two-hour State Required Mental Health Training Block every two years. Pothoff was not disciplined as a result of the February 23, 2021 incident.[7]

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff."[8] The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."[9]

Conway brings his claims under Section 1983 of Title 42, which provides that an officer acting under color of law who subjects a person or causes that person to be subjected to a deprivation of constitutional rights is liable to that person.[10] Conway

---

[6] Copies of Dubuque County Jail's policies are included in the record. Pl. App. 92-223.

[7] Sheriff Joseph Kennedy, Sergeant Michael Brehm, and Jail Administrator Michael Muenster each found Deputy Pothoff acted reasonably under the circumstances. Pl. App. 33-34, 66-68; 73-74.

[8] *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

[9] *Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

[10] *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

6

alleges deliberate indifference for his medical needs, *Monell*[11] liability for failure to train, and excessive use of force.

### A. Deliberate Indifference

A pretrial detainee has a right to medical care under the Due Process Clause of the Fourteenth Amendment, though the standard is the same as that used for prisoners whose rights arise under the Eighth Amendment's prohibition against cruel and unusual punishment.[12] To establish his deliberate indifference claim, Conway must prove that he "suffered from an objectively serious medical need" and that "an official 'actually knew of but deliberately disregarded [the] serious medical need.'"[13] Defendants concede they were aware that Conway had two serious medical needs: diabetes and mental health issues. The only question is whether Defendants disregarded these serious medical needs. This subjective element requires Defendants "to have 'recognized that a substantial risk of harm existed *and* kn[own] that their conduct was inappropriate in light of the risk.'"[14] Conway must show more than negligence (even gross negligence) or disagreement with treatment decisions.[15] Conway must show "a mental state 'akin to criminal recklessness'" where the treatment was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care."[16]

Conway alleges he made clear his medical needs (diabetes and mental health), "that he frequently asked for assistance and medical services for these conditions, and

---

[11] *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978).

[12] *Jackson v. Buckman*, 1060, 1065 (8th Cir. 2014).

[13] *Id.*; *see also De Rossitte v. Correct Care Sols., LLC.*, 22 F.4th 796, 802 (8th Cir. 2022).

[14] *De Rossitte*, 22 F.4th at 802 (quoting *Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021)).

[15] *Jackson*, 756 F.3d at 1065; *Kendrick v. Faust*, 682 F.Supp.2d 932, 943 (E.D. Ark. 2010).

[16] *Jackson*, 756 F.3d at 1065-66 (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) and *Dulany v. Carnahan* 132 F.3d 1234, 1240 (8th Cir. 1997)).

7

was denied." Doc. 17-2 at 15-16. Conway first argues that Defendants were deliberately indifferent to his diabetes by failing to provide insulin on a regular basis. It is undisputed that Conway received treatment for his diabetes while detained, and he was thus not denied medical care. As for the level of care provided, the jail regularly checked Conway's blood sugar levels and provided him with insulin (both fast-acting and long-acting kinds). On the occasions he complained about his diabetes, jail staff took steps to address those concerns. With respect to his diabetes, Conway does not identify any prison official who was aware of a substantial risk of serious harm to Conway but disregarded that risk.[17]

Conway also alleges Defendants failed to address his mental health needs by failing to provide him with mental health treatment. The record shows, however, that Conway did receive mental health treatment while detained—he was provided his prescribed injection medication and saw a mental health provider. Though he submitted Sick Call Requests, none of them show he ever raised issues with his mental health treatment. The type of care he received while detained was more than he had received before his arrest (he was planning to obtain care) and consistent with the treatment he received after this incident (seeing a counselor once a month).

Conway cannot establish that a jail official failed or refused to provide treatment for his serious medical needs. Thus, he has to prove something close to criminal recklessness or inappropriate treatment that equates to intentional maltreatment.[18] There is no such evidence in the record for the treatment of either his diabetes or his mental health needs.

---

[17] ***Robinson v. Hager***, 292 F.3d 560, 563-64 (8th Cir. 2002) (citing ***Farmer v. Brennan***, 511 U.S. 825, 832 (1994)).

[18] ***Jackson***, 756 F.3d at 1066 (quoting ***Dulany***, 132 F.3d at 1241).

8

Finally, Conway argues Dubuque County and Sheriff Joseph Kennedy were deliberately indifferent based on the failure to properly train Deputy Pothoff.[19] A county can be held liable under Section 1983 for an inadequate training program that constitutes a "policy" of the county, meaning that "in light of the duties assigned to [the deputy] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need."[20] "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[21] It is possible that in "rare" instances, a county could be held liable for a single incident (rather than a pattern of conduct placing the county on notice) where "the unconstitutional consequences of failing to train could be so patently obvious."[22]

Overall, Conway asserts that Defendants' failure to provide medical treatment caused his mental health episode, which led to Deputy Pothoff using excessive force. I have already found that Conway fails to show he was denied medical treatment or that the treatment he received amounted to deliberate indifference.[23] Conway relies on *De Guidio v. Pung*[24] to support this contention that Dubuque County and Sheriff Kennedy

---

[19] To the extent Conway raised claims based on deficiencies in procedures to identify, diagnose, treat, and provide adequate care to patients, he fails to address that issue in his briefing and has waived these claims.

[20] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

[21] *Connick*, 563 U.S. at 62.

[22] *Id.* at 63-64.

[23] Conway's expert, Phil Stanley, opined that Defendants did not follow their health care policy. Pl. App. 82. This opinion relied on the assumption that Conway received no mental health treatment while detained. *Id.* This is clearly contradicted by the record, which shows that Conway received his prescribed mental health medication (the injection) and saw a mental health provider.

[24] 920 F.2d 525 (8th Cir. 1990).

9

should be liable under Section 1983 for their "deliberate" or "conscious" choice not to train.[25] *De Guidio* is easily distinguishable. Conway is the sole plaintiff to complain of Defendants' conduct, and he does not present any evidence of a pattern or series of actions that amount to conduct by Defendants of disregarding a known or obvious risk.[26] Conway's claim must therefore constitute one of the extraordinary cases where just a single incident (the failure to train) would clearly and obviously result in a constitutional violation.[27] Conway does not claim, however, that Dubuque County or Sheriff Kennedy failed to train deputies or Deputy Pothoff in particular. Indeed, the record shows that

---

[25] Doc. 17-2 at 16 (quoting *De Guidio*, 920 F.2d at 532). That case involved a tuberculosis outbreak in which nearly 200 inmates became infected over a period of a few years, and the Eighth Circuit (in determining whether De Guidio was the prevailing party in an attorney-fee dispute) noted that "inadequate training is considered a city policy only when the failure reflects a conscious or deliberate choice—deliberate indifference" and concluded that the record supported findings that "officials responded to the tuberculosis outbreak with a series of negligent and reckless actions . . . [that] constituted 'conduct . . . disregard[ing] a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.'" *Id*. at 533 (citation omitted) (second alteration in original).

[26] *See Dulaney v. Carnahan*, 132 F.3d 1234, 1241 (8th Cir. 1997) (distinguishing *De Guidio*).

> Evidence in *De Guidio* showed that the prison officials' indifference and negligence toward an outbreak of tuberculosis infections resulted in almost 200 inmates being infected within a few years. For a period of about five years during which the outbreak began and spread, no prison officials were responsible for the supervision, control, and administration of health services at the prison. *Id*. at 529. To the contrary, in the present case, . . . Primus [who suffered from tuberculosis] is the only plaintiff to raise the issue of the prison's tuberculosis treatment in the complaint, and her medical records indicate that the prison officials administered treatment to her. She has failed to present evidence from which to infer that the defendants did not respond reasonably to the risk.

*Id*.

[27] *See Connick*, 563 U.S. at 63-64 (discussing "'single-incident' liability" contemplated by the Court in *Canton* and providing a hypothetical where a city used armed police officers to apprehend fleeing felons without training the officers about the constitutional limits on the use of deadly force). Due to the high predictability in such a hypothetical that an officer's lack of training will violate people's constitutional rights, a city's decision to not train those officers would constitute deliberate indifference because "the unconstitutional consequences of failing to train could be so patently obvious." *Id*.

10

prior to this incident, Deputy Pothoff completed the Iowa Law Enforcement Academy, annual twenty-hour jail school trainings, defensive tactics for jail staff, medical training, police response to resistance and aggression, and a mental health training block. Pl. App. 45, 87-88.

> Conway claims that Deputy Pothoff was not *adequately* trained.
>
> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.[28]

Conway does not explain how Deputy Pothoff's training was inadequate, nor that any inadequacy in the training made a violation of detainees' civil rights so obvious that Dubuque County and Sheriff Kennedy could be held liable.[29] This case is far from the hypothetical posed in *Canton*—that a city could be held accountable for deliberate indifference by failing to train officers on using deadly force when the officers' duties included apprehending fleeing felons, which would foreseeably result in a violation of citizens' rights.[30]

Conway also argues that Sheriff Kennedy does not monitor detainees' access to treatment or deputies' completion and certification of required training. Even if that were the case, it does not establish "systemic deficiencies in the method of providing medical care" that would amount to deliberate indifference.[31] Thus, summary judgment should be granted on Conway's deliberate indifference and *Monell* failure to train claims.

---

[28] *City of Canton*, 489 U.S. at 390-91.

[29] Conway also included policies and procedures for the Dubuque County Jail in the record (Pl. App. 92-223), but it is unclear which policy or policies Conway takes issue with.

[30] *Id*. at 390, n. 10.

[31] *De Guidio*, 920 F.2d at 532.

11

### B. *Excessive Use of Force*

"The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from 'the use of **excessive force** that amounts to punishment.'"[32] This protects pretrial detainees from *any* punishment (not just cruel or unusual punishment), and thus, force cannot be used to injure, punish, or discipline a pretrial detainee.[33] Force used for a legitimate governmental purpose does not constitute prohibited excessive force.[34] Put another way, an officer "may reasonably use force in a good-faith effort to maintain or restore [order] but may not use it maliciously or sadistically to cause harm."[35] "Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability" for excessive use of force.[36]

To establish excessive use of force, Conway must prove that that the force used against him was purposeful or knowing and that the force was objectively unreasonable.[37] Mere negligence is not sufficient—an officer "must possess a purposeful, a knowing, or possibly a reckless state of mind."[38] Proof of intent must be determined in the context of "rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation."[39] The "objective reasonableness" of an officer's actions turns on the 'facts and circumstances of each particular case' . . . from the perspective

---

[32] *Jackson*, 756 F.3d at 1067 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[33] *Id*.

[34] *Id*.

[35] *Story v. Norwood*, 659 F.3d 680, 686 (8th Cir. 2011).

[36] *Jackson*, 756 F.3d at 1068 (quoting *Askew v. Millerd*, 191 F.3d 953, 958 (8th Cir. 1999)).

[37] *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

[38] *Id*. at 396; *Folkerts*, 707 F.3d 975, 980 (8th Cir. 2013) (discussing how the conduct must "shock the conscience" and "only a purpose to cause harm *unrelated to the legitimate object of* [the government action in question]" is required) (quoting *Helseth v. Burch*, 258 F.3d 867, 872 (8th Cir. 2001)).

[39] *Folkerts*, 707 F.3d at 981 (quoting *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005)).

of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."[40] Relevant factors may include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."[41]

Here, Conway told Deputy Pothoff that he was having suicidal thoughts. He walked away from Deputy Pothoff and forcefully hit his head on a table three times, falling to the ground after the third hit. Deputy Pothoff responded quickly and stood over Conway, who was quiet at first but soon began to thrash about and yell (including telling Pothoff to kill him). Deputy Pothoff wrote in his incident report that he "gently" put his hand on Conway's chest to keep him on the ground, asked if he was okay, and told him to not move and to relax. Def. App. 55. Conway began yelling and would not acknowledge anything that Deputy Pothoff said. *Id*. Deputy Pothoff radioed for assistance. *Id*. The video is consistent with Deputy Pothoff's report—it shows that Conway continued to move around and yell, and then got to his feet. As Conway was getting to his feet, Pothoff put his arms around Conway, and shortly thereafter, they went to the floor.

Deputy Pothoff intentionally placed his arms around Conway, but the parties dispute how they ended up on the floor. Deputy Pothoff claimed they fell by accident while he tried to subdue Conway, and Conway argues that Deputy Pothoff intentionally threw him to the ground.[42] Deputy Pothoff reported that as Conway "tried to jump to his feet" that Deputy Pothoff "physically restrained" Conway "in an attempt to prevent

---

[40] *Kingley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[41] *Kingsley*, 576 U.S. at 397.

[42] That Conway was suffering from mental health issues does not change the analysis of whether Deputy Pothoff acted reasonably in trying to prevent Conway from further harming himself.

13

[him] from harming himself further." Def. App. 55. Deputy Pothoff noted that Conway "was actively resisting and refusing me and refusing to obey orders to stop." Deputy Pothoff reported that "Conway's entire body was tense as we went to the floor and he continued to pull away from me." Def. App. 55. Deputy Pothoff later testified that they "fell to the floor." Pl. App. 44. By contrast, Conway testified that after banging his head on the table, the next thing he recalled was Deputy Pothoff "tackling" him to the ground. Conway believed that Deputy Pothoff intentionally threw him to the ground, but he could not recall specific details of the incident. Def. App. 112-13. There is no evidence to support a finding that Deputy Pothoff intended to injure or punish Conway. Indeed, he radioed for assistance as soon as Conway started to become combative and prior to them going to the floor.

Nothing in the record supports that Deputy Pothoff's attempt to subdue Conway "was anything other than responding to and mitigating" the situation.[43] Considering the totality of circumstances and factors provided in *Kingsley*, Deputy Pothoff acted reasonably.[44] The entire incident lasted mere seconds, illustrating that Deputy Pothoff had to respond to the rapidly-evolving situation. Conway demonstrated a clear intent to harm himself by banging his head on the table, during which he knocked himself to the ground. His yelling also demonstrated that he wanted to be harmed. Deputy Pothoff had a legitimate interest in keeping Conway from further harming himself. Deputy Pothoff tried to keep Conway on the ground by placing his hand on Conway's chest and by using

---

[43] *Jackson*, 756 F.3d at 1069 (noting the court's obligation to determine whether the action was taken "for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose") (quoting ***Bell v. Wolfish***, 441 U.S. 520, 538 (1979)).

[44] Conway relies on the opinion of Phil Stanley that Pothoff used excessive force because Conway did not present a danger or threat to Deputy Pothoff. Pl. App. 84-85. The record shows, however, that Deputy Pothoff used force to prevent Conway from further injuring himself, not to protect Deputy Pothoff or others from Conway. The record includes information that Sheriff Kennedy, Sergeant Michael Brehm, and Jail Administrator Michael Muenster, who each reviewed the incident, believed that Deputy Pothoff acted reasonably. Pl. App. 33-34, 68, 73-74.

14

verbal commands.  Conway disregarded Deputy Pothoff's efforts and got to his feet. Even if Deputy Pothoff intentionally threw Conway to the ground, this does not amount to excessive force—an officer may reasonably subdue a person who is only passively resisting by forcefully throwing the person to the ground and holding him there.[45]  Here, Conway was actively resisting and made it known (through his yelling) that he intended further harm to himself.  Conway clearly sustained a significant injury as a result of the force used, but this factor alone does not support a finding that Deputy Pothoff acted unreasonably.[46]  The record does not present any material issue of fact on the excessive force claim, and therefore summary judgment should be granted.

### III.  CONCLUSION

The court **GRANTS** Defendants' motion for summary judgment (Doc. 13). Judgment should be entered in favor of Defendants.

**SO ORDERED** on June 15, 2023.

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[45] *Blazek v. City of Iowa City*, 761 F.3d 920, 923-25 (8th Cir. 2014) (discussing other cases where court held throwing person to the ground was reasonable in the context of attempts to handcuff the person).

[46] *Id.* at 924-25 (discussing how it would be untenable to determine reasonableness of force used based on whether injury resulted).